IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CAROLYN SUE FARNSWORTH,

Plaintiff,

v.                                                  Civil Action No. 5:07-CV-129

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.


**REPORT AND RECOMMENDATION
SOCIAL SECURITY**


**I. Introduction**

A.      Background

Plaintiff, Carolyn Sue Farnsworth, (Claimant), filed her Complaint on October 3, 2007,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on January

4, 2008.[2]  Claimant filed her Motion for Summary Judgment and Brief in Support of Motion for

Summary Judgment on March 4, 2008.[3]  Commissioner filed his Motion for Summary Judgment

and Brief in Support of Motion for Judgment on the Pleadings on April 3, 2008.[4]  Claimant filed

her Response to Motion for Summary Judgment on April 15, 2008.[5]

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket Nos. 12 and 13.

[4] Docket No. 14.

[5] Docket No.15.

B.    The Pleadings

    1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.    Defendant's Brief in Support of Motion for Summary Judgment.

    3.    Claimant's Response to Motion for Summary Judgment.

C.    Recommendation

    I recommend that:

    1.    Claimant's Motion for Summary Judgment be **DENIED**.  The ALJ's conclusion that there is other work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity is supported by substantial evidence.  Furthermore, the ALJ was under no duty to further develop the record, as the record before him was adequate to determine Claimant's disability.  Finally, the ALJ's hypothetical posed to the Vocational Expert (VE) was improper; however, it constituted a harmless error because there was no evidence that a proper hypothetical would have resulted in a different finding by the ALJ regarding the availability of jobs in the national economy.  In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

    2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

    Claimant filed an application for Supplemental Security Income on September 30, 2004 alleging disability since April 9, 2003 due to muscle problems/arthritis in right neck and

shoulder, spinal and left leg pain, and shortness of breath. (Tr. 57, 65). The West Virginia

Disability Determination Service (DDS) denied the application initially on January 21, 2005 and

upon reconsideration on July 11, 2005. (Tr. 36, 43). On September 9, 2005, Claimant requested

a hearing before an Administrative Law Judge (ALJ). (Tr. 46). Claimant received a hearing

before an ALJ on July 11, 2006. (Tr. 172). On September 11, 2006 the ALJ issued a decision

adverse to Claimant. On September 29, 2006, Claimant requested review of the ALJ's decision.

(Tr. 14). The Appeals Council issued a form letter on August 3, 2007, denying Claimant's

request for review. (Tr. 4). Having exhausted her administrative remedies, Claimant filed this

action, which proceeded as set forth above.

B.     Personal History

        Claimant was 49 years old on the date of the July 11, 2006 hearing before the ALJ. Her

date of birth is February 19, 1957. (Tr. 57). Claimant completed high school and has prior work

experience as a router. She set glass and snipped rough spots off the sides of window frames.

(Tr.66). Claimant also has limited experience working in a plastic factory. (Tr. 181). Claimant

also has worked as a cook. (Tr. 182).

C.     Medical History

        The following medical evidence is the only medical evidence relevant to the issue of

whether there is work in significant numbers in the national economy that Claimant could

perform, given her age, education, work experience and residual functional capacity:

**Mountain State Physical Therapy, Functional Capacity Evaluation (FCE), 11/1/01 (Tr. 104)**
Physical Examination
ROM:
Lumbar side forward flexion: 0-48°           Extension:           0-25°
Right side bending:            0-25°*         Left side bending:   0-25°*

*Side bending self-limited due to subjective complaints of increased pain.

| Shoulder (seated AROM) | Right | Left |
|---|---|---|
| Flexion | 0-106° | 0-126° |
| Abduction | 0-94° | 0-110° |
| Shoulder (supine PROM) | | |
| Flexion | 0-85°* | 0-130°* |
| Abduction | 0-85°* | 0-132° |
| ER | 0-37° | Full |
| IR | 0-48° | Full |

*Limited by empty end-feel. Rotation on right hand had to be measured in 45° shoulder abduction due to patient unable to tolerate normal test position at 90°. She complains of crepitus with right shoulder rotation. When asked if range of motion is limited by pain or simply the inability of it to move farther, she responds "both."

Strength:
Bilateral lower extremities are 5/5 throughout with cogwheel effect noted in all muscle groups. Posterior shoulders/upper back strength is 4/5, no cogwheeling noted.
Special Tests:
Slump and straight leg raise tests are negative bilaterally. Client sets limits range of straight leg raise to 30° on the right and 40° on the left due to subjective complaints of provisional anterior thigh pain. She denies increased pain in back, buttocks, or posterior thigh and leg. Reflexes of the upper and lower extremities are equal and strong bilaterally. Waddell's is positive for simulated rotation, compression, distraction, overreaction, and negative for palpation. She is point tender over thoracic and lumbar paraspinatus and over linen crests bilaterally. Bony landmarks appear level.

Functional Ambulation Assessment
Psyiological signs were within normal limits. Client chose to keep the treadmill speed at the very minimum and refused to increase speed due to complaints that "this speed is faster than I walk." She denies any increase in back pain throughout testing but does complain of headaches. Her heart rate began at 101 bpm, then gradually decreased to as low as 88 bpm, indicating sub-maximal effort.

Material handling was tested using the Blankenship and PILE protocols. The client was able to perform the following resistive movements on the associated basis:

|  | OCCASIONAL | FREQUENT | CONSTANT | PAIN | WEAKNESS | MECHANICS | FATIGUE | GOAL ACHIEVED |
|---|---|---|---|---|---|---|---|---|
| Floor to Knuckle | 23 | 9 | X | | | X | | |
| Knuckle to Shoulder | 18 | 9 | | | | X | | |
| Shoulder to Overhead | 9 | 4 | | | | | | |
| Two Hand Carry | 28 | 14 | | | | | | |
| One Hand Carry | R-19 L-29 | 9 14 | | | | | | |
| Pushing | 12.5 | 6 | X | X | | | | |
| Pulling | 12.6 | 6 | | | | | | |

Comments: The client was not placed in a physical demand category secondary to testing incompetencies. She performs lifting activities today as noted above, including floor to knuckle lift with 23 pounds. She indicates increase in back pain with floor to knuckle and the pushing activity only. All activities are self-limited by the patient due to complaints of weakness or the box being "too heavy."

Floor to knuckle lifting is performed with patient kneeling on the floor due to complaints of not being able to squat that low. When setting the box down at knuckle level, she falls over the box sits it down unusually hard. These weakness behaviors appear exaggerated in nature.

Knuckles to shoulder lift is performed with arms kept close to her sides. She does not take box very far from her body, creating difficulty getting the box to shoulder height. With the shoulder to overhead activity, the client gives an uneven effort, with the box higher on the left side due to subjective complaints in the right shoulder. With no weight added to the box, she is unable to raise her shoulders beyond 90° and keeps her elbows bent. With the one hand carry, the client has an exaggerated response to the addition of a 5-pound weight, which was visually larger in size than the previous 5-pound weight. The client uses her legs to swing the box and appears to toss it onto its destination. These weakness behaviors appear exaggerated in nature. The client takes very small steps while doing the push/pull activity and keeps elbow bent and in at her sides.

<u>Non-Material Handling Evaluation:</u>
Revealed the client was able to perform the following non-resistive movements on the associated

basis:

| | NEVER | OCCASIONAL | FREQUENT | CONSTANT | PAIN | WEAKNESS | MECHANICS | FATIGUE | GOAL ACHIEVED |
|---|---|---|---|---|---|---|---|---|---|
| Repetitive Stooping | | | | X | | | | | X |
| Sustained Stooping | | | X | | X | | X | | |
| Repetitive Overhead Reaching | | | X | | X | | | | |
| Repetitive Forward Reaching | | | | X | | | | | X |
| Repetitive Squatting | | | X | | | | X | | |
| Sustained Squatting | | | X | | | | X | | |
| Repetitive Unilateral Kneeling | | | X | | X | | X | | |
| Sustained Bilateral Kneeling | | | X | | X | | | | |
| Driving-30 minutes per subjective report | | | | | | | | | |
| Sitting-15-30 minutes per subjective report | | | | | | | | | |
| Standing-10 minutes per subjective report "But I have to do more" | | | | | | | | | |
| Walking-10 minutes per subjective report "If allowed to walk slow at my own pace" | | | | | | | | | |
| Stair Climbing | | | X | | X | | | | |

Comments: With repetitive stooping, the client denies increase in back pain, but complains of a burning sensation in her back. It was confirmed with her that she did not consider this an increase in pain. The client did report an increase in subjective complaints of back pain with sustained stooping, and demonstrated increased knee flexion and forward flexion of the trunk as time progressed. The client complains of a burning sensation in the back with forward reaching, but again denied an increase in pain. The overhead reach activity is performed very slowly. She demonstrates full AROM on the left and at least 100° of abduction on the right. At the conclusion of this test, the client complains of pulling in a lot of muscles she "didn't think I had." She again complains of a burning sensation and denied increase in pain on the pain scale. She did report, however, increased headaches.

Repetitive squatting is performed very slowly, with her only complaint being that of a burning sensation in the quadriceps. She was unable to complete 35 repetitions because she reached the 5 minute time limit for this test. She complains of a pulling sensation in her knees with sustained squatting, but is agreeable to continue. She repositions her feet frequently during this activity. With repetitive kneeling the client reports increased back "thumping" and headaches, but denies increase in back pain and denies any knee pain. She uses her hands on her thighs for support and occasionally pushed off when rising from a kneeling position. Occasional crepitus noted in both knees. Sustained kneeling is performed with subjective complaints of increased knee pain, but no increase in back pain.

Job Simulation Circuit:
•     Handling of simulated glass for 5 minutes
•     Handling of small weighted items for 5 minutes

The client demonstrates the ability to handle small to medium size square-shaped items weighing up to 9 pounds for 5 minutes without an increase in back pain. She demonstrates the ability to handle smaller items weighing 5 pounds or less for 5 minutes, but movements are slow and she reported an increase in pain in the right posterior shoulder area. There was minimal change in the heart rate with both activities.

Non-Organic Profile:
The client's Oswestry Low Back Pain Questionnaire score of 53.3% indicates that this client perceives herself as having a severe disability.

The client's Cervical Oswestry Pain Questionnaire score of 36% indicates that this client perceives herself as having a moderate disability.

The client scored positively in 4 of 5 Waddell categories. This score is positive for possible non-organic pain behavior.

The client scored 0 points on the Ransford Pain Diagram. This score is negative for possible non-organic pain behavior.

Recommendations:
Return to work at the physician's discretion.

**Fairmont General Hospital, Emergency Room, 3/16/02 (Tr. 113)**
Reason for visit: Trouble breathing/chills, fever
Patient left without being seen

**Pro Medical Rehab, Inc., J. David Lynch, M.D., 9/19/01-6/11/02 (Tr. 117-119)**
9/19/01 History of Present Illness:
Patient relates on 1/10/01 she had injured her neck and right shoulder region. She had cervical spine x-rays done 1/16/01 which (sic) mild to moderate degenerative changes in the mid to lower

cervical spine. Thoracic spine also showed some mild degenerative changes and mild scoliosis and an old T-12 anterior wedge deformity unchanged from the June 1994 x-rays. She has continued to have difficulties with her right lower paracervical and right perithoracic muscles. She had a cervical MRI done on 3/26/01 which showed mild disc bulge and posterior osteophyte complex at C3-4, C4-5 and C5-6 but not herniated disc. She relates that she has constant soreness in right lower neck and right perithoracic region. She relates she has pain with lifting her arms above her shoulders.

6/11/02 Subjective:
Patient relates she has not gotten any better. She describes constant neck pain from right side down into her thoracic region and she relates every other week she gets swelling in that area. She smokes ½ pack of cigarettes a day, no alcohol use.

**Fairmont General Hospital, David McClellan, M.D., 8/11/04 (Tr. 120)**
Patient presents with deep vein thrombosis of the left lower extremities (DVT LLE). A Color Doppler duplex scan was done on left lower extremity.

Findings: Left common femoral, profunda femoral, superficial femoral, and popliteal veins were identified. All veins showed spontaneous flow with normophasic variation and normal augmentation. Veins compressible. No thrombus seen.

Impression: No evidence of deep vein thrombosis left leg.

**The Manchin Clinic, John Manchin II, D.O., 6/23/94-8/17/04 (Tr. 124)**
April 16, 2003
Subjective:      Follow-up for cervical pain, says it still goes up to the upper extremities but now she has pain that radiates down to the dorsal spine
Objective:       Tender in the peridorsal musculature. Decreased range of motion with side bending, rotation, flexion and extension of the cervical spine.

April 23, 2003
Subjective:      Numbness in both upper extremities and also lumbosacral pain
Objective:       Both hands - there is no significant neuromuscular deficit
                 Back - Decreased range of motion with side bending, rotation, flexion and extension

May 22, 2002 Report to RTW Rehabilitation Services
Current Diagnosis:     Cervical Dorsal Sprain
Prognosis:             Patient should be able to return to modified light duty

Assessment:
Patient can do the following activities:
   •      Sit for 1 hour at a time and for 1-2 hours total during the day
   •      Stand for 2 hours at a time and for 3-4 hours total during the day

- Walk for 1 hour at a time and for 1-2 hours total during the day
- Bend for less than 1 hour at a time and for less than 1 hour total during the day

Patient cannot do the following activities:

Squat, stoop, crawl, kneel, climb, push/pull, foot control, reach.

Patient can occasionally lift and carry between 21 and 25 pounds. She can frequently lift and carry between 1 and 10 pounds. Occasional hand manipulation and fine manipulation with the right hand and frequent manipulation with the left.

March 27, 2001
MRI of Cervical Spine:

Mild impressions upon the anterior aspect of the thecal sac at the C3-4, C4-5, and C5-6 levels. These mild impressions are most likely due to a combination of mild bulging discs and posterior osteophytes. No definite focal disc herniation is seen. No significant spinal stenosis. No significant impingement upon the neural elements is seen. Cervical cord appears normal.

January 16, 2001
X-Rays - Cervical Spine and Thoracic Spine:

Multiple views of the cervical spine show disc space narrowing and osteophyte formation at the C4-5 and C5-6 levels. No fractures are seen. No significant neural foraminal narrowing is seen. Multiple views of the thoracic spine show a mild right upper thoracic scoliosis and mild left lower thoracic scoliosis. Mild degenerative changes are seen throughout the thoracic spine. There is some anterior wedging of T12, which is stable and unchanged when compared with exam of 6/23/94.

**Fairmont Medical Group, Silvina Padro, M.D., DDS Physical Exam, 12/27/04 (Tr. 149)**

Subjective: Patient complains of shortness of breath all the time. She has a history of asthma and chronic obstructive pulmonary disease. She is a smoker. Exercise tolerance is decreased to 1/4 mile walking slowly. Also complains of chronic right shoulder and neck pain as well as chronic low back pain, secondary to lifting at work. Patient says she has had a reaction to chemicals at work and has not worked since. She lives alone and has stayed independent in activities of daily living.

Habits: Smokes one pack of cigarettes per day since the age of 13. No alcohol, no drugs.

Objective:

Musculoskeletal: The patient walks with normal gait. She was able to walk on heels and toes. Back: Forward flexion was normal. She does have scoliosis and kyphosis. On palpitation of the spine there is no tenderness or paraspinal tenderness. Straight leg raising was negative bilaterally. The patient was able to squat. She did not have much trouble getting on and off of the examination table. Examination of the right shoulder, there was decreased active range of motion secondary to pain. There was also slightly decreased passive range of motion.

Assessment:

History of asthma/chronic obstructive pulmonary disease, smoker. She might benefit from

pulmonary evaluation.  Right shoulder pain compatible with osteoarthritis.  Mild to moderate impairment of function of the right arm secondary to the pain.  She is to follow up with her primary care physician for better pain management.

**Atiya Lateed, M.D., Physical Residual Functional Capacity Assessment, 1/14/05 (Tr. 162)**

Exertional Limitations
Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry (including upward pulling) 10 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry

Postural Limitations
Occasional climbing ramp/stairs, balancing, stooping, kneeling, crouching, crawling.  Never climbing ladder/rope/scaffolds due to right shoulder pain and decreased range of motion

Manipulative Limitations
None established.  Patient mentions slight decreased range of motion in right shoulder with passive range of motion but does not give degree of limitation.

Environmental Limitations
Avoid concentrated exposure to extreme cold, wetness, humidity and vibration.
Avoid even moderate exposure to fumes, odors, gases, poor ventilation, etc. due to mild chronic obstructive pulmonary disease.
Avoid hazards such as machinery, heights, etc. due to degenerative joint disease of the right shoulder and cervical spine.

D.      Testimonial Evidence

        Testimony was taken at hearings held on July 11, 2006.  The following portions of the

testimony are relevant to the disposition of the case.

        Q       All right.  You signed up for your disability on September 30th of '04 and you

said that you actually became disabled in April of '03.  When did you last work?

        A       Since '03.

        Q       April of '03?

        A       Yeah.

Q        Why did you leave work at that time?

A        Because my hands went numb.

Q        Were you injured on the job?

A        Yes.

Q        Did you file a workers comp claim?

A        No.  All they did was send me to therapy.

Q        But you didn't file a workers compensation claim against it?

A        No.

                        *                *                *

Q        Now, my review of your record indicates that you, you've, you alleged some

problems with your neck.

A        Yeah.

Q        And you have some problems in your upper back - -

A        And - -

Q        Neck and upper back.

A        And lower back.

Q        And some problems with your right arm and shoulder.

A        And left, well, my both hands.

Q        And you have some breathing problems from smoking.  Is there anything else?

A        Just that I have problems with my knee all the time.

Q        I don't see any treatment for a knee, or I don't see any treatment for hands.  I, I do

see your left leg where they tested you for deep venous thrombosis and I they didn't find

anything.  I don't see any treatment for a knee injury, I don't see any treatment for a knee condition, and other than your comments about your shoulder or arm so you're going to have to help me out.  What's wrong with your arm?

A    The arthritis, and then I have tendinitis and then - -

Q    Elbow?

A    Yeah.  It's in the elbow.

Q    Now, which arm is that?  Right or left?

A    The right.

Q    Okay.

A    And I have carpal tunnels in my hands.

Q    Okay.  You have any surgeries since you've - -

A    No.

Q    Made application on anything?

A    No.  I can't afford none of it.

*                *                *

Q    Okay.  And most of your pain is located where?

A    From my neck down.

Q    And is it constant or does it come and go?

A    Well, the right side's usually there all the time.  Sometimes this side over here, it comes but it goes [INAUDIBLE].

Q    And it's just mainly in your back and neck?

A    Well, the right side of the back and neck, but the arms too, you know.

Q      Okay.  Legs and hips?

A      The hips, it goes with the back but the knees, they didn't, they didn't kind of hurt me.

Q      Okay.  Do you do anything else besides take the Ibuprofen?

A      Well, I use heating pads but I had to quit the other day.  They kind of burnt me.

Q      On a scale from zero to ten, ten being the worse pain, are you in pain today?

A      Probably a six.

Q      Is that generally what it is all the time?

A      No.  Sometimes it's higher.

Q      What makes it worse?

A      I would say moving around a lot.

Q      Okay.  Does the Ibuprofen help you?

A      Yeah.

Q      Do you have any side effects?

A      I haven't had them.

Q      How far can you walk on level ground?

A      Without stopping or just walking?

Q      Just walk on level ground.  How far can you, how far can you go or how long can you go?  Either way.

A      Half a mile, I don't know [INAUDIBLE].

Q      How about standing?

A      Standing, I can probably stand an hour or so.

Q       Can you bend over?

A       I bend down.

Q       All right.  Let, let me ask you bending, stooping, and squatting.  Which one do you think you were describing to me?

A       I, I, I bend my knees and - -

Q       That's squat of stoop, kind of scoot stoop.  You bring - -

A       You bring, you bring, you bend your knees and you go down.

Q       All right.  What about squatting?  Just bend your knees without bending forward?  Just go straight down with your knees, can you do that?

A       I don't know about that.  I might fall over.

Q       All right.  Nothing hurts though?

A       Yeah.  It's hurts, yeah - -

Q       Okay.

A       It pulls.

Q       All right.  Where does it hurt?  Back?

A       The lower back.

Q       What about your knees?

A       They usually hurt when I got pressure on them.

Q       I see.

A       That's like walking.

Q       All right.

A       Or standing on them, that's when they really ache.

Q      Are you right handed or left handed?

A      Right.

Q      Can you make a fist with both your hands?

A      Yeah.

Q      Can you demonstrate both?  Any problem doing that?

A      There ain't no pressure to them.

Q      Okay.  But does it, did that hurt to do that?

A      No.

Q      All right.  When you touch your hand together, do you have feeling in your hands?

A      Just tingling.

Q      Can you hold a fork and spoon?

A      Yeah.

Q      Button your clothing?  Zip your zippers?  Can you do that?

A      Most of my clothes is elastic.

Q      Okay.  Can you pull them on over your head?

A      Yeah.

Q      Lifting, how much can you lift?

A      I'd say maybe 20, 25 pounds at the most and I have to be stretching.

Q      Sitting, like you are now?

A      Sitting, maybe an hour or a little more.  It just depends on whether or not I take a pill.

*        *        *

Q     Now, with respect to your ability to take care of your personal needs. For example, can you either bathe or shower?

A     I bath.

Q     Dress yourself - -

A     I dress myself.

Q     Perform your personal hygiene needs without having a personal care attendant or help.

A     I can, I can bath myself.

Q     All right. Now, you have a history of being able to cook. Do you do your own cooking?

A     Hardly ever. I usually eat sandwiches.

Q     So, just - -

A     Or like, if I cook, I would, you know, I'd just make something easy.

Q     Do you have benefit of a microwave?

A     Yeah.

Q     You not, use that a lot?

A     Pretty well.

Q     Okay. Now, I need to know how you spend your time in a typical day. It could be a good day or a bad day, but generally what time do you find yourself up for the last time in the mornings?

A     I'm usually up about daylight. I, I watch TV, I, I, get out and walk around with

my chickens, I feed the chickens.

Q        How many do you have?

A        How many chickens?  100.

Q        Are they all yours to take care of?

A        Yeah.

Q        You have to feed them and things like that?

A        Yeah.  I just throw corn to them.  I mean, it's, it's no hard work.

*                *                *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        In regarding to your hands, you indicated that you have carpal tunnel syndrome?

A        Uh-huh.

Q        And who diagnosed you with carpal tunnel?

A        Manchin.

Q        Okay.  And does, does he treat for, do you take any treatment for that or just pain medication?

A        Just pain medication.

*                *                *

Q        Have you had adequate opportunity to review the vocational and other exhibits of record?

A        Yes sir.

Q        Would there be any additional information you would need to have from the claimant before you could respond to my questions about her past work?

A       No sir.

Q       All right.  Would you classify the claimant's past work in the 15 years from the date of her application?  The date that began September 30th of '04 and going backwards for a period of 15 years.

A       Okay.  The glass setter, the gluer for windows, and the snipper, is recognized in the DOT under what's listed as a a window assembler.  And that's recognized medium exertional.  It's an occasional preparation to be semi-skilled.  Now, the router is a separate classification, and that's recognized as a medium SVP four, semi-skilled.  Now, in testimony she indicated times lifting 100 pounds.  So, in her performance of the job she was performing at the heavy exertional level.  The work as the trimmer for mold, mold trimmer, that's recognized as light, semi-skilled, SVP three.  In addition to that, looks like the file talks about work as what's recognized as a plastic laborer.  And that's medium unskilled, SVP two.  Institution cook, medium, SVP five, skilled.

Q       All right.  From her past work, some of it was semi-skilled - -.

A       Uh-huh.

Q       One was skilled, Would she have any skills that could transfer to other exertional levels of work activity?

A       Yes sir.  An institutional cook, the physical skills of cooking, would transfer to what's recognized as short order cook.  That's a light exertional, [INAUDIBLE] preparation at three, semi-skilled.  Now, what's listed as the, the router, that could transfer to a different industry that uses the same equipment.  And that's recognized as rotor for printed circuit boards.  And that's a light exertional, SVP four, semi-skilled.

ALJ     Okay.  All right.  It appears that we have an individual who's between the ages of 47 and 49, still a younger individual under the regulations.  And she has, she testified she graduated from high school.

CLMT        Yeah.

BY ADMINISTRATIVE LAW JUDGE:

Q       And the past relevant work that you've identified.  The State Agency in this case proposed a hypothetical, which is in the record at Exhibit 7F.  So, assume that it was relevant for an individual hypothetically that she could lift 20 pounds occasionally, ten pounds, frequently, standing and walking six hours in an eight hour day with normal breaks, sit six hours in an eight hour day with normal breaks, occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl, but never climb any ladders, ropes, or scaffolds, and because of the conditions as treated, avoid concentrated exposure to cold temperatures, wetness, and humidity, and vibration because of the breathing problems in this, even though she smokes she should avoid even moderate exposure to fumes, dust, fodders, gasses, and pollutants.  So, taking that hypothetical for such an individual as the claimant, would any of the claimant's past work be available for her to perform?

A       The mold trimmer, the way it's customarily performed would be, and the way she described performing it.

Q       In such a, I believe she testified that she, with respect to that work, that she only did it for, I need to find my notes, work in one to two months.

A       One or two months, that's what, the Mack Plastics.

Q       What would be your opinion from a vocational standpoint as to whether or not

that would be the, kind of a sufficient amount of time to learn the, I believe you classified it as semi-skilled.

A        Yeah.  It takes over one month, up to including three months in order to learn how to perform a semi-skilled at SVP three.  She's borderline with that, sir.   Because of that reason.

Q        Okay.  Now, would, would the, looking at the transferrable skills.

A        Yes, sir.

Q        First of all, with respect to the cook, short order cook, was that light?

A        The short order cook is light, semi-skilled, SVP three.

Q        Would there be anything from the hypothetical of, that I gave previously for an individual that would preclude that work at light?

A        Unfortunately when you mention even moderate fumes or, or odors - -

Q        Uh-huh.

A        You do have in a kitchen that, and also the [INAUDIBLE], especially when someone burns something that becomes a - -

Q        All right.

A        Big issue.  And the other one that was the light, as the router.

Q        Yes.

A        There's some vibration involved in that, so that would have to be taken in consideration.

Q        So, those transferrable skills would not be available?

A        I would feel - -

Q        For those jobs?

A      Yes.  Based on - -

Q      All right.

A      The hypothetical.

Q      Let's assume then that because of the marginal length of time that such an individual worked at the molding trimmer work, and because the transferrable jobs at the light exertional level would not be available, could you identify jobs in the national and regional economy, the regional economy to be defined by you, that such an individual could perform with a hypothetical as that which I have given you?

A      Yes, sir.

Q      Sure.

A      All right.  The following would fit.  Okay.

Q      Just a, just a minute.

A      I'll wait.  Okay.  The following would fit within the hypothetical that's given. Information clerk.  It's light exertional, specific vocational preparation of two.  Now, for the region I'm utilizing the state of West Virginia, along with the five recognized metropolitan statistical areas.  There would be 95,000 nationally, region, 800.  Storage facility rental clerk. Light, specific vocational preparation of two.  85,000 national, over 300 regional.  Folding machine operator.  Light, specific vocational preparation of two.  There 75,000 national and for the region, over 300.  That's a sample, Your Honor.

Q      All right.  Now, assume that, assume that the claimant's testimony is considered completely credible and supported by her medical evidence of record.  And it would, to the point that she can't even lift ten pounds on a regular basis occasionally or five pounds on a frequent

basis, and her ability to do unskilled is affected by her ability to concentrate for that type of work due to her pain and discomfort that she has from her conditions.  If that would be the case, would there be any jobs that she would perform in the economy?

A    No sir.  There would not be.

Q    Okay.  And all of the light work that you've identified would be eliminated?

A    That's correct, sir.

Q    Would you have several examples of the same hypothetical that I gave you, but reducing them to sedentary.  Would there be any, any, any sedentary work if we reduced it?

A    Yes.  There would be.

Q    All right.

A    Plastic design applier, sedentary, specific vocational preparation of one.  60,000 national, 300, regional.  Laminator, sedentary, specific vocational preparation of two.  75,000 national, 400 regional.  Final assembler, 43,000 national.  It's sedentary, SVP two.  And for the region there's 50.

*                    *                    *

Q    Okay.  The folding machine operator, would that involve the use of machinery?

A    Yes sir.

Q    And if the corrected establish, the claimant needs to avoid heat and water exposure to machinery would she be able to perform that?

A    No.  She would not.

Q    How about the plastic design applicator?

A    That's also monitoring a machine.  So, likewise, would be prevented.

Q        Laminator?

A        Likewise, monitoring a machine, therefore also prevented.

Q        How about final assembler?

A        No.  A bench worker.

Q        Bench work?

A        Yes sir.

Q        That would involve prolonged sitting?

A        That could be performed with the change of position, ten minutes sitting, ten minutes standing, but anything more frequent than that would prevent it's ability to perform it. So, the person would have to be able to at least sit for ten minutes or stand for ten minutes.

Q        Okay.

A        Okay.

Q        Would that involve the fine use of the hands?

A        Yes.

Q        Okay.  And if the claimant were limited, in her testimony were truthful in her having carpal tunnel certainly would, would that affect her whole [INAUDIBLE]?

A        If she can't use her hands then she wouldn't be able to perform the job, no.

Q        Information clerk - -

A        Yes sir.

Q        Briefly, if you could describe the duties of that position.

A        Yes.  Person answers inquiries, questions, people come into businesses, they're the ones that are sitting at the desk.  Someone wants to find out, where someone is located.

Q        Like a receptionist?

A        Exactly, it's an unskilled receptionist.

Q        And how about storage facility rental clerk?

A        Likewise.  It's like an unskilled receptionist.  The responsibility is individuals come in, they're looking at the storage facility, they make sure the person signs in, makes sure the time is written that they went into the facility.  They're working inside of a, a little office.

Q        Okay.  Each of those jobs would require sitting, standing?

A        Likewise.  The person could sit ten minutes, stand ten minutes, alteration.  You know, from a vocational standpoint, if a person has to change position more frequently than ten minutes, they're not capable of performing any type of work.

*                    *                    *

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life:

Makes coffee, checks mail, watches tv, takes walks. (Tr. 82)

Feeds rabbits and 100 pet chickens.  (Tr. 82, 192)

Cooks, washes dishes, does laundry, sweeps and dusts.  (Tr. 84, 194)

Shops for groceries. (Tr. 86, 192-93)

Can lift 20 to 25 pounds.  (Tr. 189)

Bathes and dresses herself.  (Tr. 191)

Smokes one pack of cigarettes per day since age 13.  (Tr. 199)

### III.  The Motions for Summary Judgment

A.      <u>Contentions of the Parties</u>

Claimant contends that the ALJ's conclusion that there is other work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity, is not supported by substantial evidence.  The Court has construed Claimant's brief to allege two instances of error on the ALJ's part: 1) the ALJ failed to develop the record regarding Claimant's limitation in reaching due to decreased range of motion of the right shoulder; and 2) the ALJ failed to consider the opinion of State agency physicians that Claimant should avoid even moderate exposure to machinery due to degenerative joint disease of the right shoulder and cervical spine.

Commissioner maintains that the ALJ's conclusion that there is other work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity is supported by substantial evidence.

B.      <u>The Standards</u>.

1.      <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.    <u>Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

10.     Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986).  The ALJ must identify the standard to be applied.  Id. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  Id.

11.     Social Security - Non-treating physician.  It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  Hayes, 907 F.2d at 1456.  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law is applied, not to substitute the Court's judgment for that of the Commissioner.  Id.

12.     ALJ's Duty to Inquire Into the Evidence.  "[T]he ALJ has a duty to explore all relevant facts and to inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the Claimant when that evidence is inadequate."  Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981).  See also Cook, 783 F.2d 1168.  When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded.  Marsh v. Harris, 632, F.2d 296, 300 (4th Cir. 1980).

13.     Social Security - Vocational Expert. Once it is established that a Claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the Claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

14.     <u>Social Security - Vocational Expert - Hypothetical.</u>  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the Claimant's impairments.  <u>Walker v. Bowen</u>, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," <u>Koonce v. Apfel</u>, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[1], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  <u>Copeland v. Bowen</u>, 861 F.2d 536, 540-41 (9th Cir. 1988).

15.     <u>Vocational Expert Purpose.</u>   "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular Claimant can perform." <u>Cline v. Chater</u>, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).  "[R]equiring the testimony of a vocational expert is discretionary." <u>Hall v. Harris</u>, 658 F.2d 260, 267 (4th Cir. 1981).

16.     <u>Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.</u>  Based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  <u>France v. Apfel</u>, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir.1986)).

17.     <u>Vocational Expert and the DOT</u>.  SSR 00-4p states in part that "occupational

---

[1]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

evidence provided by a VE or vocational specialist (VS) should be consistent with the occupational information supplied by the D.O.T.  When there is an apparent unresolved conflict between VE or VS evidence and the D.O.T., the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the Claimant is disabled."

18.     DOT.  "Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs.  Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling. The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p

19.     Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking is often necessary in carrying out job duties.  Jobs are sedentary if is walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §§ 404.1567(a),

416.967(a).

20. <u>Light Work</u>. Light work is defined in the regulations as: "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

21. <u>Social Security - Severe Impairment</u>. An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a Claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). <u>See also</u> <u>Byrd v. Apfel</u>, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[2] Social Security Ruling 85-28.

22. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from

---

[2] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

23. Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met.  Cook , 783 F.2d 1168.  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[3]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3).  The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

24. Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant

---

[3] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing

Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

C.     Discussion

1.     Whether the ALJ Failed to Fully Develop the Record

Claimant contends the ALJ erred at step five of the sequential analysis because he failed
to develop the record regarding Claimant's limitations in reaching due to decreased range of
motion of the right shoulder.  At step five the burden is on the Commissioner to establish that
there was other work Claimant could do, given her age, education, work experience and residual
functional capacity.  English v. Shalala, 10 F.3d 1080, 1082 n.1 (4th Cir. 1993).  Specifically,
Claimant avers that the ALJ should have contacted the consultative examiner, Dr. Ali Lateef, to
obtain a complete report indicating how the decreased range of motion in the cervical spine and
shoulder restricted her ability to perform reaching in any direction.  Claimant argues that the
ALJ's failure to develop the record in this regard was a prejudicial error because Claimant's
inability to reach would preclude her from being able to perform the jobs identified by the
vocational expert, and thus the Commissioner would not have met his burden at Step Five of the
sequential analysis.

The Fourth Circuit has held that "the ALJ has a duty to explore all relevant facts and
inquire into the issues necessary for adequate development of the record." Cook, 783 F.2d at
1173.  Although a Claimant has a duty to diligently supply medical records to the SSA
documenting the Claimant's impairments and limitations, the Commissioner bears the
responsibility of developing the Claimant's complete medical history.  20 C.F.R. §§ 416.912(d),
404.1740(b); See Smith v. Barnhart, 395 F. Supp.2d 298, 302 (E.D.N.C. 2005).  Therefore,

where a Claimant's medical records are "inadequate" to determine whether she is disabled, the ALJ must seek additional records and is obligated to re-contact Claimant's treating physicians "and seek additional evidence or clarification" from them. 20 C.F.R. § 416.912(e)(1); Smith, 395 F. Supp.2d 298 at 301.

In addition, "The Claimant must also show (s)he was prejudiced by the inadequate record and that, had the ALJ complied with the regulation, he 'could and would have adduced evidence that might have altered the result." Hyde v. Astrue, 2008 U.S. App. LEXIS 10228 (5th Cir.)[4] (citing Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir. 1984)). Remand is necessary where the ALJ fails to fulfill his duty to develop the medical record and the Claimant is prejudiced as a result. Walker, 642 F.2d at 714. Prejudice results where the Commissioner's decision "might reasonably have been different had the evidence been before [him] when the decision was rendered." King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979). Evidentiary gaps that result in unfairness or clear prejudice require a remand. Brown v. Shalala, 44 F.3d 931, 935-36 (11th Cir. 1995); See also Marsh, 632 F.2d at 300.

The ALJ in the present case determined Claimant retained the residual functional capacity to perform a range of work activity that:

> "Requires no more than a light level of physical exertion;[5] requires no climbing of ladders, ropes or scaffolds, or more than occasional climbing of

---

[4] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

[5] Light work requires lifting no more than 20 pounds at a time occasionally and 10 pounds frequently. 20 C.F.R. §§ 404.1567(b), 416.967(b). Light work also involves a good deal of walking or standing or sitting most of the time with some pushing and pulling of arm or leg controls. Id.

ramps or stares; requires no more than occasional balancing, crawling, crouching, kneeling, or stooping; and entails no concentrated exposure to extreme cold temperatures, humidity, vibration or airborne/environmental pollutants (e.g., dust, fumes, gases, noxious odors, smoke).  (Tr. 20).

At the hearing, the ALJ posed the following hypothetical to the VE:

"Assume that it was relevant for an individual hypothetically that she could lift 20 pounds occasionally, ten pounds, frequently, standing and walking six hours in an eight hour day with normal breaks, sit six hours in an eight hour day with normal breaks, occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl, but never climb any ladders, ropes, or scaffolds, and because of the conditions as treated, avoid concentrated exposure to cold temperatures, wetness, and humidity, and vibration because of the breathing problems in this, even though she smokes she should avoid moderate exposure to fumes, dust, fodders, gases, and pollutants...Could you identify jobs in the national and regional economy, the regional economy as defined by you, that such an individual could perform with a hypothetical as that which I have given you?"  (Tr. 199-201).

In response to the hypothetical, the VE responded that the light exertional jobs of information clerk, storage facility rental clerk and folding machine operator were a sample of jobs that would be available.  (Tr. 201).  The ALJ then asked the VE to further assume that Claimant can not even lift ten pounds and her ability to do unskilled [work] is affected by her ability to concentrate for that type of work due to her pain and discomfort.  (Tr. 201).  The VE responded that if this were the case the light jobs identified would be eliminated, but that the following sedentary work is available: 1) plastic design applier; 2) laminator; and 3) final assembler.  (Tr. 202).  Claimant's counsel then asked the VE whether Claimant would be able to perform the jobs of folding machine operator, plastic design applicator and laminator if she had to avoid exposure to machinery.  The VE responded that Claimant would be unable to perform these jobs in that situation.  (Tr. 202-03).  The VE indicated that the positions of information clerk, storage facility rental clerk and final assembler could be performed by Claimant regardless

of her need to avoid exposure to machinery.

Of the six positions identified by the VE, only the information clerk, storage facility rental clerk and final assembler do not require exposure to machinery. However, they do require at least frequent reaching. Claimant argues that the ALJ's failure to re-contact Dr. Lateef to learn whether her limitation of motion of the right shoulder impaired her ability to reach was a crucial oversight. Claimant contends that if she were precluded from performing frequent reaching, she would be unable to perform any of the jobs identified by the vocational expert.

Claimant contends that the Commissioner's regulations provide that the Social Security Administration will re-contact the medical provider who performed the consultative examination to furnish the missing information or prepare a revised report. Claimant specifically cites 20 C.F.R. § 416.919p(b) (2007) to support her argument that the ALJ was under a duty to re-contact the state agency physician, Dr. Lateef, to determine Claimant's degree of limitation in her right shoulder. This argument fails, however, because the regulation requires the ALJ to ask that the medical source furnish missing information or prepare a revised report only where the report is *inadequate or incomplete*. (Emphasis added). An ALJ is required to re-contact medical sources only when the evidence before him is inadequate to determine whether the Claimant is disabled. See Skarbek v. Barnhart, 105 Fed. Appx. 836 (7th Cir. 2004). See also Moody v. Barnhart, 114 Fed. Appx. 495 (3d. Cir. 2004) (no need to re-contact physician because there was sufficient evidence in the medical records before the ALJ to make her decision)[6]; Robertson v. Chater, 900 F. Supp. 1520, 1530 (D. Kan. 1995) ("Pertinent inquiry is whether the record contained

---

[6]   This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

sufficient medical evidence for the Commissioner to make an informed decision as to the Claimant's alleged impairment").

Here, Dr. Lateef performed a complete and thorough physical RFC exam on Claimant. In his report, on page 4, he indicates that Claimant has no manipulative limitations. A note on page 4 shows that the Claimant mentions slight decreased range of motion of the right shoulder with passive range of motion. Claimant did not give a degree of limitation. However, Dr. Lateef's objective findings show that Claimant has no limitations reaching in all directions (including overhead). Moreover, Dr. Lateef stated in his report that Claimant "appears to be only partially credible." (Tr. 169).

The ultimate responsibility for determining a Claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946. Administrative law judges need only consider the findings of state agency medical consultants as opinion evidence. An ALJ is not bound by any of the findings. 20 C.F.R. § 416.927(e)(2)-(3). Claimant believes the ALJ violated the command of Gordon, 725 F.2d at 235 by failing to indicate the weight he gave to the reports of Drs. Lateef and Franyutti. However, Claimant's reliance upon Gordon is misplaced. There was conflicting medical evidence in that case and the ALJ did not indicate why he chose to believe one side over the other. It is clear that the ALJ in the present case considered the state agency opinions and accorded them "considerable" weight. (Tr. 24).

Furthermore, the ALJ had the opportunity to weigh Claimant's credibility through her testimony at the hearing. According to Shively, 739 F.2d ay 889, the ALJ's observations concerning Claimant's credibility are to be given great weight. See Shively, 739 F.2d at 889 citing Tyler, 409 F. Supp. 776. "Because hearing officers are in the best position to see and hear

the witnesses and assess their forthrightness, we afford their credibility determinations special

deference.  See Nelson, 131 F.3d at 1237.  The Claimant testified at the hearing that she cooks,

washes dishes, shops for groceries, can lift between 20 and 25 pounds, bathes and dresses

herself, and even feeds her 100 pet chickens daily.  (Tr. 172).  Here, there is ample medical and

testimonial evidence to document Claimant's physical limitations, or lack thereof.  The ALJ fully

discussed the medical records and there was no legal error.

### 2.    Vocational Expert Hypothetical

Claimant argues that the hypothetical question propounded to the vocational expert did

not accurately account her medical limitations.  Specifically, Claimant alleges that the ALJ

should have included the need to avoid "even moderate" exposure to machinery in the

hypothetical question to the vocational expert.  The Commissioner counters that even

considering Claimant's alleged need to avoid exposure to moving machinery, there was still a

significant number of jobs available to Claimant.

The issue is whether the hypothetical question properly set forth all the relevant evidence

of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has held,

albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set

out all of the Claimant's impairments, the question need only reflect those impairments

supported by the record.   Russell v. Barnhart, No. 02-1201, 2003 WL 257494, at 4 (4th Cir. Feb.

7, 2003)[7].  The court further stated that the hypothetical question may omit non-severe

impairments, but must included those that the ALJ finds to be severe.  Id.  Moreover, based on

---

[7]   This Court recognizes that the United States Court of Appeals for the Fourth Circuit
disfavors citation to unpublished opinions.  I recognize the reasons for that position and
acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in
this regard.

the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France, 87 F. Supp.2d at 490 (citing Martinez, 807 F.2d at 774).

Regarding the relevancy of the VE's testimony, Claimant refers this Court to Walker, 889 F.2d at 50 for the proposition that the testimony of a vocational expert is relevant only if it is in response to a proper hypothetical question which includes all of Claimant's limitations. The issue before this Court is distinguishable in that the ALJ in Walker did not ask questions that ensured that the VE knew what the Claimant's abilities and limitations were. The Walker Court was concerned with the fact that there was no indication that the VE in that case had studied the evidence of record and therefore could not have reached the necessary level of familiarity with that particular Claimant's impairments and abilities.

In the present case, the hypothetical does not directly track the RFC finding. In posing the hypothetical, the ALJ failed to mention the Claimant's need to avoid exposure to machinery. However, the ALJ specifically references the RFC Report as Exhibit 7F and the vocational expert presumably had an opportunity to review the exhibit both before the hearing and during his testimony. The VE testified that he had an adequate opportunity to review the vocational and other exhibits of record. (Tr. 197). The Court finds that the ALJ's failure to mention any exposure to machinery in the hypothetical was error, but constitutes harmless error, because there is no evidence the inclusion of the limitation in the hypothetical to the VE would have resulted in a different finding by the ALJ regarding the availability of jobs in the national economy. See Mickles v. Shalala, 29, F.3d 918, 921 (4th Cir. 1994) [holding remand is not

necessary, despite ALJ's initial error, where ALJ would have reached same result notwithstanding his error.]. The Court so finds because there is no indication in the job descriptions for provided by Claimant for the information clerk, the storage facility rental clerk and the final assembler that Claimant would be exposed to machinery of any kind in these positions.

Claimant argues that the elimination of the folding machine operator, the plastic design applicator and the laminator jobs would reduce the number of light exertion jobs by nearly 30% (75,000 out of 255,000) and the number of sedentary jobs by over 75% (135,000 out of 178,000). This argument, however, misses the point. The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A). The work does not have to exist "in the immediate area in which" the Claimant resides. Id.; 20 C.F.R. § 404.1566(a)(1) (stating it is irrelevant whether "work exists in the immediate area in which you live"). The Fourth Circuit has stated that "the regulations make irrelevant the Claimant's actual ability to work...the Secretary must show that work exists in the national economy which the Claimant could perform." Pass v. Chater, 65 F.3d 1200, 1205 n. 4 (4th Cir. 1995). The Court also quoted 20 C.F.R. § 416.966(a) for this proposition. Id. Therefore, the issue before the Court is whether there is at least one suitable occupation representing a significant number of jobs in the economy. See Barker v. Secretary of Health and Human Services, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (finding 1266 jobs in the local economy significant); Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) (finding 1350 jobs in the local economy significant).

The VE's testimony indicates that there are 95,000 information clerks nationally and 800 regionally; there are 85,000 storage facility rental clerks nationally and over 300 regionally; and there are 43,000 final assemblers and 50 regionally. This amounts to suitable occupations that Claimant could perform representing a significant number of jobs in the economy, specifically, 223,000 jobs nationwide and 1,150 regionally. Accordingly, this Court finds that there is substantial evidence indicating Claimant has "significant numbers" of work available to her and therefore is not entitled to benefits.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED**. The ALJ's conclusion that there is other work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity is supported by substantial evidence. Furthermore, the ALJ was under no duty to further develop the record, as the record before him was adequate to determine Claimant's disability. Finally, the ALJ's hypothetical posed to the Vocational Expert (VE) was improper; however, it constituted a harmless error because there was no evidence that a proper hypothetical would have resulted in a different finding by the ALJ regarding the availability of jobs in the national economy. In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: August 27, 2008

/s/ James E. Seibert

JAMES E. SEIBERT

UNITED STATES MAGISTRATE JUDGE